UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PETER RUSSELL,
    *Plaintiff*,

v.

ANDREW SAUL,
    *Defendant*.

No. 3:18-cv-02025 (JAM)

**ORDER REVERSING DECISION OF THE COMMISSIONER OF SOCIAL SECURITY AND REMANDING FOR CALCULATION OF BENEFITS**

Plaintiff Peter Russell claims that he is disabled and unable to work because of lumbar degenerative disk disease, chronic scoliosis, bipolar disorder, and paranoia. He has brought this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security, who denied his claim for Title II social security disability insurance benefits. Russell has filed a motion to reverse the decision of the Commissioner, Doc. #16, and the Commissioner has filed a *pro se* motion to affirm his judgment, Doc. #18.[1] For the reasons discussed below, I will grant Russell's motion to reverse the decision of the Commissioner and remand for calculation of benefits.

**BACKGROUND**

I refer to the transcripts provided by the Commissioner. *See* Doc. #14. Before discussing Russell's application for disability benefits, it is helpful to briefly recapitulate Russell's medical history to place the discussion that follows in context. On the physical side, Russell suffers from

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Clerk of Court shall substitute the Commissioner of Social Security Andrew M. Saul as the defendant in place of Acting Commissioner Nancy A. Berryhill who was initially named as the defendant.

1

degenerative disk disease and chronic scoliosis, brought on by a workplace injury in 2007 when he fell off a truck and tore two disks in his back. *See id.* at 96 (Tr. 89).[2]

Most relevant to the present proceeding, however, is Russell's long history of mental illness—most prominently, bipolar disorder, delusions, and paranoia. He reported symptoms beginning at the onset date in 2010 when in short order he got divorced, lost his job, lost his home, ended up living in his car, and was then incarcerated in federal prison in New Jersey for a year for passing out badly counterfeited twenty dollar bills at a gas station. *See id.* at 91-93, 131-34 (Tr. 98-100, 138-41); *see also United States v. Russell*, No. 6:11-cr-220-ACC-DAB (M.D. Fla. 2011).

In late 2011, for example, Russell reported to his prison physician that he could "hear voices laughing at me" which he could only "mostly . . . ignore." He also reported seeing "spiders the other day that weren't there." Doc. #14 at 705 (Tr. 698) (treatment record generated Dec. 9, 2011). Anxiety, bipolar disease, and depression were noted on multiple prison medical documents throughout his term of incarceration. *See, e.g.*, *id.* at 758-60 (Tr. 751-53) (treatment record generated May 19, 2012); *id.* at 825 (Tr. 818) (evaluation generated Aug. 1, 2012).

These symptoms persisted. Shortly after his release from prison, Russell was hospitalized after a suicide attempt. *See id.* at 995-96 (Tr. 988-89) (hospital records for admission Sept. 2012). An extended pattern of mental health hospitalizations occurred throughout the 2012-2017 period, *see, e.g.*, *id.* at 965, 1205, 1589 (Tr. 958, 1198, 1582), following episodes that included Mr. Russell driving the wrong way on the highway, *id.* at 146, 1096 (Tr. 139, 1089), and being

---

[2] Page references are to the pagination generated on the Court's CM/ECF docket. For ease of reference, a citation to the internal Social Security Administration transcript number is provided in the form (Tr. ##).

found unconscious and shirtless on a 40-degree night in a post office parking lot, *id.* at 1063 (Tr. 1056).

While all this was going on, Russell pursued an application for disability benefits that has now stretched for nearly eight years in adjudication. He filed an initial application for disability benefits on September 14, 2012, alleging a disability beginning on January 10, 2010. *Id.* at 165 (Tr. 158). Russell's claim was denied on February 22, 2013, *id.* at 177 (Tr. 170), and denied again upon reconsideration on June 3, 2013, *id.* at 194 (Tr. 187). He then filed a request for a hearing on June 11, 2013. *Id.* at 164 (Tr. 157).

Russell appeared and testified before an Administrative Law Judge (ALJ) on June 3, 2014. *Id.* at 88-122 (Tr. 81-115) (hearing transcript). On July 25, 2014, the ALJ issued a decision concluding that Russell was not disabled within the meaning of the Social Security Act. *See id.* at 198-207 (Tr. 188-200) *et seq*. The Appeals Council reversed and remanded on February 17, 2016, finding that the ALJ improperly weighed medical evidence respecting Russell's mental impairments, and did not consider the extent to which Russell's mental limitations eroded the occupational base for the sedentary work his back problems restricted him to. *Id.* at 213-17 (Tr. 206-210).

The ALJ proceeded to reconsider Russell's case upon remand. Another hearing was held on April 24, 2017, *id.* at 123-163 (Tr. 116-56), after which, on August 2, 2017, the ALJ once again ruled that Russell was not disabled. *Id.* at 34-49 (Tr. 27-42). The Appeals Council denied Russell's request for review of this second ALJ determination on October 18, 2018, *id.* at 8 (Tr. 1), and Russell then filed this action on December 11, 2018. Doc. #1. Although Russell was represented by an attorney up to and including the second Appeals Council proceeding, he has filed and litigated this federal court action *pro se* and *in forma pauperis*.

To qualify as disabled, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and "the impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A)). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [claimant] live[s] or in several other regions of the country," and "when there is a significant number of jobs (in one or more occupations) having requirements which [claimant] [is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(a)-(b); *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009).

The agency engages in the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or his past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019); 20 C.F.R. § 404.1520(a)(4).

In applying this framework, if an ALJ finds a claimant to be disabled or not disabled at a particular step, the ALJ may make a decision without proceeding to the next step. *See* 20 C.F.R.

§ 404.1520(a)(4). The claimant bears the burden of proving the case at Steps One through Four; the burden shifts at Step Five to the Commissioner to demonstrate that there is other work that the claimant can perform. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

After proceeding through all five steps, the ALJ concluded that Russell was not disabled within the meaning of the Social Security Act. At Step One, the ALJ concluded Russell had not engaged in substantial gainful activity since January 10, 2010, the date of the claimed onset of Russell's disability. Doc. #14 at 50 (Tr. 33). At Step Two, the ALJ found that Russell suffered from the following severe impairments: "lumbar degenerative disc disease, chronic scoliosis; bipolar disorder; opioid dependence on agonist therapy; [and] substance abuse disorder." *Ibid*.

At Step Three, the ALJ determined that Russell did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Ibid*. The ALJ considered Russell's physical impairments as well as his mental impairments. *Id*. at 40-42 (Tr. 33-35).

Moving to Step Four, the ALJ then found that Russell had the following residual functional capacity ("RFC"):

> [T]o perform sedentary work as defined in 20 CFR 404.1567(a) except that he is capable of simple, repetitious, routine work that does not require teamwork. He can occasionally interact with co-workers and supervisors; no contact with the public. He can occasionally bend, balance, twist, squat, kneel, crawl and climb. He can occasionally reach overhead with the left master arm. He uses a cane to walk only.

*Id*. at 42 (Tr. 35). At Step Four, the ALJ concluded that Russell had no past relevant work that he could be capable of performing. *Id*. at 47 (Tr. 40).

At Step Five, after considering Russell's age, education, work experience, and RFC, the ALJ concluded that there were jobs that Russell could perform that existed in significant

numbers in the national economy. *Id.* at 47-48 (Tr. 40-41). In reaching this conclusion, the ALJ explained in his ruling that he "asked [a] vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all these factors the individual would be able to perform the requirements" of three representative occupations: polisher, document preparer, and touch-up screener. *Id.* at 48 (Tr. 41).

But that is not all the vocational expert testified to. At the hearing, the ALJ posed the vocational expert ("VE") an additional hypothetical:

> ALJ: [A]ssume an individual of the claimant's age, education, and past relevant work experience who is limited to the sedentary exertional level as defined in our regulations and is unable to stay on task for more than . . . 80 percent of a day . . . due to various limitations. . . could such a person perform their past relevant work?
>
> VE: No, your honor.
>
> ALJ: Based on this same profile would there be other jobs available? And if so, could you provide examples . . . ?
>
> VE: If that were the case such a person would be precluded from all work.

*Id.* at 154-55 (Tr. 147-48). Later, under cross-examination, the vocational expert testified that if the hypothetical person had "a serious problem . . . asking questions or requesting assistance," that limitation (combined with the other limitations posed by the ALJ above) would preclude all work. *Id.* at 160 (Tr. 153).[3]

In other words, the vocational expert made it clear that if someone with Russell's RFC was unable to stay on task for more than 80 percent of the day, or had serious difficulties asking

---

[3] The vocational expert further testified, on cross-examination, that a hypothetical person "unable to focus in order to perform work activities," or with "difficulty in doing basic work activities at a reasonable pace and finishing," or for whom it was determined that "they cannot perform work activity on a sustained period – for eight hours a day, five days a week," would be precluded from all work. *Id.* at 158-59 (Tr. 151-52).

6

questions or requesting assistance, there would be no work for that person in the national economy. Nonetheless, the ALJ ultimately concluded that Russell's RFC contained no limitations on staying on task. Then, the ALJ relied on the testimony of the vocational expert that someone with Russell's physical limitations but no limitation on concentration could perform jobs like polisher, document preparer, and touch-up screener to conclude that the Commissioner met his burden at Step Five. Accordingly, the ALJ determined that Russell was not disabled within the meaning of the Social Security Act. *Id*. at 48 (Tr. 41).

## DISCUSSION

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

Russell has not submitted a conventional motion in this proceeding, instead filing a copy of his former attorney's Appeals Council brief and a short collection of annotated medical records. As Russell is *pro se*, I must liberally construe these submissions to raise the strongest arguments they suggest. *See McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017). I understand Russell to move to reverse the decision of the Commissioner on the ground that the ALJ traversed the treating physician rule, which in turn led to the formulation of an RFC

not supported by substantial evidence to the extent that it excluded Russell's inability to stay on task more than 80 percent of a working day.[4]

### *The treating physician rule*

The treating physician rule requires that "the opinion of a [plaintiff's] treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(c)(2)).

When the treating physician's opinion is not given controlling weight, "the ALJ must explicitly consider" a number of factors to determine the proper weight to assign, including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (*per curiam*)); *see generally* 20 C.F.R. § 404.1527(c). The ALJ then must "give good reasons in [his] notice of determination or decision for the weight [given the] treating source's [medical] opinion." *Estrella*, 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*)). Unless "a searching review of the record" provides assurance that "the substance of the treating physician rule was not traversed," an ALJ's failure to apply the factors listed in *Estrella* leaves the Court unable to conclude the error was harmless and requires remand. *Ibid*. (quoting *Halloran*, 362 F.3d at 32-33).

---

[4] Russell also argues that the ALJ erred in his evaluation of Russell's back condition. *See* Doc. #16 at 11-12. It is not necessary for me to determine this claim in light of my determination that the ALJ's error in evaluating Russell's psychological condition requires reversal even taking for granted the ALJ's preexisting determination of Russell's back condition.

8

In concluding that Russell's RFC incorporated the mental limitations of simple, repetitious, routine work that does not require teamwork, occasional interactions with co-workers (no interaction with the public), and no other limitations, the ALJ rejected the opinions of Dr. Ovanessian, Russell's principal treating psychiatrist. Dr. Ovanessian, who treated Russell for years, explained in detail that Russell suffered from a cocktail of severe and debilitating mental illnesses that rendered him not merely unfit to work but "unable to function on a daily basis." Doc. #14 at 1015 (evaluation conducted May 2013).

In so doing, the ALJ tacitly—and correctly—concluded that acceptance of Dr. Ovanessian's opinions would, at a minimum, impose a far more significant limitation on Russell's capacity to concentrate, persist, or maintain pace than his RFC ultimately contained. Dr. Ovanessian's May 2013 function-by-function evaluation of Russell, *id.* at 1020-23 (Tr. 1013-16), described Russell as "psychotic." Dr. Ovanessian described Russell has having "serious problems" on a daily basis with "changing from one simple task to another," and "a very serious problem" (the highest possible ranking) with "performing basic work activities at a reasonable pace/finishing on time," and "performing work activity on a sustained basis, i.e. 8 hours per day, 5 days a week," *id.* at 1022 (Tr. 1015).

Several months later, Dr. Ovanessian's observations in a comprehensive September 2013 medical source statement provided context for these function-by-function limitations. He explained that Russell "has been diagnosed with major depression disorder, general anxiety disorder, bipolar II disorder, suicidal ideations, hallucinations, [and] acute delirium" among many other things. *Id.* at 1059 (Tr. 1052). After recapitulating what appear to be at least eight hospitalizations for mental health issues, *see id.* at 1060 (Tr. 1052), Dr. Ovanessian explained that Russell's mental health issues "prevent him from performing many tasks as he needs to

9

concentrate on the task at hand and he cannot do that because of his state of mind." *Id.* at 1061 (Tr. 1054).

Dr. Ovanessian provided a follow-up function-by-function analysis of Russell's deficiencies in November 2016, *see id.* at 1419-25 (Tr. 1412-18), recapitulating Russell's "severe bipolar disorder with many suicide attempts before at least 10 previous psychiatric hospitalization[s] . . . very manic," *id.* at 1422 (Tr. 1415), going on to describe Russell's ability to "maintain attention and concentration for extended periods, . . . perform activities within a schedule, maintain regular attendance, [and] be punctual within customary tolerances" as "markedly limited"—the highest rating, meaning "cannot usefully perform or sustain the activity." *Ibid.* He further found that Russell's ability to "complete a normal workday/workweek without interruptions from psychologically based symptoms[, p]erform at a consistent pace without an unreasonable number and length of rest periods, [and] sustain an ordinary routine without special supervision" was "moderately limited" such that his "capacity to perform the activity was diminished." *Ibid.*

The ALJ justified the rejection of Dr. Ovanessian's opinions and medical source statements on the following grounds: (1) Dr. Ovanessian incorrectly stated that Russell's substance abuse was in remission in May 2013, and his opinions were predicated on that error; (2) Dr. Zachmann, another of Russell's treating physicians, "noted much lower ratings" of Russell's impairments than Dr. Ovanessian, and "great[er] weight has been given to her opinion" rather than that of Dr. Ovanessian because she "was seeing the claimant three times a week" and she considered the effects of substances where Dr. Ovanessian did not; (3) Dr. Ovanessian's statements did not contain "function by function limitations"; (4) Dr. Ovanessian's account of Russell's "marked limitations" was "not supported [by] the treatment notes"; and (5) Dr.

Ovanessian saw Russell "following hospitalizations, which does not give a longitudinal picture of overall functioning." Doc. #14 at 46 (Tr. 39).

Although these reasons relate to the factors set out in *Estrella*, they are not supported by the record. First, the ALJ's claim that Dr. Ovanessian failed to account for Russell's addiction to painkillers, *see* Doc. #14 at 46 (Tr. 39) (ALJ opinion), is not supported by the record. The report in which the ALJ claims Dr. Ovanessian overlooked Russell's past history of addiction includes a notation, in the admittedly borderline-illegible handwriting for which the medical profession is famous, that among Russell's "Axis 1" disorders is "Opioid dependence on Methadone." *Id*. at 1012 (Tr. 1013). Although Dr. Ovanessian did note elsewhere that Russell was in "remission," *ibid*., in context it is plain that the "remission" refers to Russell's prior (before the disability onset period) addiction to heroin, for which methadone was the prescribed treatment. And in any event, Dr. Zachmann recorded the same combination of notes in her own opinions compiled at the same time. *Id*. at 1024 (Tr. 1017). This was not a basis, then, for the ALJ to prefer Dr. Zachmann's report over Dr. Ovanessian's when both reports performed the same analysis and made the same mistake—if a mistake it was.[5]

Second, the ALJ mischaracterized Dr. Zachmann's opinions that appear to conflict with those of Dr. Ovanessian. A review of those opinions reveals that Dr. Zachmann's disagreements with Dr. Ovanessian were minor, at least as far as task performance goes. In her 2013 medical source statement, Doc. #14 at 1024-28 (Tr. 1017-21), which was compiled at around the same time as Dr. Ovanessian's statement opining Russell was precluded from all work, *id*. at 1020-23 (Tr. 1013-16), Dr. Zachmann's function-by-function assessment of Russell's task performance

---

[5] The ALJ further misstated the record when he declared that Dr. Ovanessian "did not consider the effects of substances," *id.* at 46 (Tr. 39), when in fact Dr. Ovanessian discussed in some detail the impact of substances on Russell's "ability to use judgment while performing work." Doc. #14 at 1061 (Tr. 1054).

11

described a "slight to obvious" problem with "carrying out multi-step instructions," an "obvious" problem with "focusing long enough to finish assigned simple activities or tasks," and an "obvious to serious" problem with "performing work activity on a sustained basis, i.e. 8 hours per day, 5 days a week," *id*. at 1026 (Tr. 1019).

To be sure, these evaluations were less severe in some respects than those described by Dr. Ovanessian, who by contrast felt Russell had a "serious" rather than "obvious" problem focusing long enough to finish simple tasks, and a "very serious" rather than "obvious to serious" problem with sustained performance of work activities eight hours per day five days per week. *Id*. at 1022 (Tr. 1015).[6] But the difference was, at most, one of degree. Indeed, Dr. Zachmann, rather than Dr. Ovanessian, noted an "appearance of auditory hallucinations," *id*. at 1024 (Tr. 1017), and "auditory hallucinations telling him mean things and laughing at him, delusions—believes that Feds . . . [are] watching him, helpless, hapless, ideas of worthlessness, racing," *id*. at 1025 (Tr. 1018).

A mental status exam given by Dr. Zachmann in 2017 repeated these conclusions, noting "auditory hallucinations . . . voices tell him to end it all." *Id.* at 1612 (Tr. 1605). None of this uncontradicted medical testimony from Dr. Zachmann was acknowledged by the ALJ, nor did the ALJ explain how he could simultaneously give Dr. Zachmann's opinion, including presumably her reports of auditory hallucinations, "greater weight" while discounting Russell's accounts of the same hallucinations. *Id*. at 46 (Tr. 39).

---

[6] Notably, however, Dr. Zachmann had in some respects a more *pessimistic* view of Russell's limitations than Dr. Ovanessian did. Where Dr. Ovanessian thought Russell had only a slight problem with "caring for physical needs," Dr. Zachmann thought the problem was "obvious to severe," *contrast* Doc. #14 at 1021 (Tr. 1014), *with id*. at 1025 (Tr. 1018); and where Dr. Ovanessian felt Russell's problems in carrying out multi-step instructions were "obvious" but likely to recur only weekly, Dr. Zachmann thought they were "slight to obvious" but likely to recur *daily*, *contrast id*. at 1022 (Tr. 1015), *with id*. at 1026 (Tr. 1019).

12

In summary, the ALJ appears to have concluded that, because Russell's treating physicians disagreed about the severity of the downpour of mental health troubles afflicting him, it followed that Russell's condition was not seriously impaired (at least as far as task performance was concerned). This was error. The ALJ is of course free to favor one treating physician over the other if that physician's view better accords with the record evidence. *See, e.g.*, *LaBreque v. Astrue*, 2011 WL 285678, at *5 (D.N.H. 2011). The ALJ is not free to use the fact of disagreement between treating physicians to disregard even the facts on which they agree. Doing so traverses the treating physician rule.

Third, the ALJ's determination that Dr. Ovanessian's opinions did not contain function-by-function limitations both misstates the record and is beside the point. As for the record, Dr. Ovanessian gave a function-by-function analysis not once but twice: first in his original opinion in May 2013, Doc. #14 at 1020-23 (Tr. 1013-16), then again in November 2016, Doc. #14 at 1419-25 (Tr. 1412-18). As for the point, a function-by-function analysis is not an ironclad requirement for medical source statements anyway; "the Social Security Administration's regulations sweep broadly, defining medical opinions as reflecting judgments about the nature not just of what a claimant can functionally do, but also 'symptoms, diagnosis[,] and prognosis.'" *Monahan v. Berryhill*, 2019 WL 396902, at *3 (D. Conn. 2019) (citing 20 C.F.R. § 404.1527(a)(1)). Even if Dr. Ovanessian had failed to conduct a function-by-function analysis of Russell's condition, that failure did not reflect on Dr. Ovanessian's opinions about Russell's mental impairments.[7] *See also Stango v. Colvin*, 2016 WL 3369612, at *11 (D. Conn. 2016) ("If

---

[7] The ALJ specifically gave little weight to the September 2013 opinions because its conclusion that, among other things, Russell "could not concentrate due to his state of mind" was not a "function by function limitation." Doc. #14 at 46 (Tr. 39). This curious conclusion is belied the Social Security Administration's own regulation listing "concentration" as a "function" relevant to determining disability, 20 C.F.R. § 1520a(c)(4), not to mention Dr. Ovanessian's two formal function-by-function analysis that describes Russell's concentration as "a serious

an ALJ's entire disability determination need not include a function-by-function assessment, a treating physician's opinion—normally entitled to controlling weight—cannot be totally disregarded for failure to perform that exercise").

Fourth, a careful review of the record indicates that, contrary to the ALJ's findings, Dr. Ovanessian's opinions are remarkably *consistent* with the treatment notes, which again and again noted Russell's mental instability, accidental overdoses on painkillers, delusions (either of voices encouraging him to self-harm or phantasmal spiders), and paranoia.[8] Dr. Ovanessian's opinions are also supported by the treatment notes from Russell's many recorded hospitalizations, like the hospitalization in 2013 where Russell was found "in parking lot shirtless with temperatures in the 40s . . . unable to effectively communicate," Doc. #14 at 1063 (Tr. 1056), or his hospitalization in 2014 when he refused to provide the number for his outpatient clinician because "he isn't fat enough," *id*. at 1451 (Tr. 1444), or his hospitalization approximately a month later when observing physicians found Russell simply unable to respond to questions at all, *id*. at 1482 (Tr. 1475), or his hospitalization in 2017 where he reported still more command auditory hallucinations "tell[ing] him to end it all," *id*. at 1612 (Tr. 1605).

The only treatment notes that might tend to contradict Dr. Ovanessian's opinions are plainly *pro forma* treatment records compiled by the federal Bureau of Prisons in 2011 and 2012, *see, e.g.*, *id*. at 748, 805, 808 (Tr. 741, 798, 808), observations from Dr. Raymond Stewart, *see, e.g.*, *id*. at 1671 (Tr. 1664), who is an internist and not a psychiatrist, *see id*. at 490 (Tr. 483), and

---

problem," Doc. #14 at 1022 (Tr. 1415) (2013 evaluation), or "markedly limited," *id*. at 1422 (Tr. 1415) (2016 evaluation).

[8] *See, e.g.*, Doc. #14 at 705, 834 (Tr. 698, 827) (prison records describing "voices"); *id*. at 1452 (Tr. 1445) (evaluation of psychiatrist Dr. Charles Morgan, dated May 2014, describing Russell's reports of "hear[ing] people screaming, see things [most recently] a couple of days ago"); *id*. at 1475 (Tr. 1468) (evaluation of Dr. Zachmann, dated May 2014, noting Russell "still hears voices"); *id*. at 1609 (Tr. 1602) (evaluation of Dr. Zachmann, dated February 2017, describing Russell's visual and auditory hallucinations).

observations from a rotating cast of nurses who saw Russell for no longer than half an hour a time, *see id*. at 989, 1674-85 (Tr. 982, 1667-78).

Indeed, the ALJ himself concluded in his Step Three analysis that Russell had a "moderate limitation" in "concentrating, persisting, or maintaining pace," drawing appropriate attention to treatment notes that showed "impaired attention and concentration with impaired memory" as well as "poor concentration," albeit with "intact cognition" and "memory," *id*. at 41 (Tr. 34) (citing Doc. #14 at 1426-38 [Tr. 1419-31], *id*. at 1476-80 [Tr. 1469-73], *id*. at 1278 [Tr. 1271]). Granting for the moment that the ALJ's evaluation is entirely supported by substantial evidence, the ALJ's failure to take into account records that he found suggested a "moderate" limitation on Russell into Russell's RFC is puzzling—especially because the ALJ *did* incorporate his Step Three finding that Russell had a "moderate limitation . . . [i]n interacting with others" into the RFC, *see id*. at 41-42 (Tr. 34-35).

Fifth, the ALJ's assertion that Dr. Ovanessian only saw Russell after hospitalizations is not supported by the record; Dr. Ovanessian was Russell's doctor for the entire relevant period up until 2016. *See, e.g.*, Doc. #14 at 1262, 1464. Although Dr. Ovanessian's treatment of Russell *began* roughly contemporaneously with Russell's hospitalization, *see id*. at 1020 (Tr. 1013) (Dr. Ovanessian evaluation dated October 2012), Dr. Ovanessian continued to treat Russell continuously, *see, e.g.*, *id*. at 1269-70 (Tr. 1262-63) (June 2014 overview of Russell's treatment by Dr. Ovanessian as being "at least once per month"). He was listed as Russell's primary mental health physician in the benefits application paperwork itself. *See id.* at 490 (Tr. 483). Hearing testimony suggested that Russell continued working with Dr. Ovanessian until as late as December 2016. *Id*. at 149 (Tr. 142).[9] If many of Dr. Ovanessian's visits with Russell coincided

---

[9] Although the transcript refers to a "Dr. Vessen [phonetic]," Doc. #14 at 149 (Tr. 142), in context this person is clearly Dr. Ovanessian.

15

with Russell's hospital stays, that was a function of Russell's incessant hospitalizations, rather than a reflection of a restriction of Dr. Ovanessian's treatment to emergency-only situations.

All in all, I conclude that the ALJ traversed the treating physician rule in his consideration of Russell's mental limitations. Moreover, by failing to incorporate even a moderate limitation on Russell's concentration into the RFC, the ALJ disregarded the opinions of Dr. Zachmann, despite acknowledging that he gave her opinions greater weight than the opinions of Dr. Ovanessian. A searching review of the record indicates to me that this error was not harmless; indeed, each and every one of the *Estrella* factors counsel *against* disregarding the opinions of Dr. Zachmann or Dr. Ovanessian: they saw him frequently over several years, medical evidence was consistent with, and strongly supported, their opinions, and they were both specialists. *See Estrella*, 925 F.3d at 935-36. At a minimum, therefore, the ALJ's decision must be remanded. *Cf. Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*).

### *Nature of Remand*

Having concluded that the ALJ traversed the treating physician rule, I must now determine whether to remand the matter to the ALJ to reconsider his analysis, giving Dr. Ovanessian's opinions the appropriate controlling weight, or simply to reverse and remand to the Commissioner solely to calculate Russell's benefits. "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," the matter should be remanded to the Commissioner "for further development of the evidence." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). But when a court has "no apparent basis to conclude that a more complete record might support the Commissioner's decision," a remand for a calculation of benefits is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999); *see also Sczepanski v. Saul*, 946 F.3d 152, 161 (2d Cir. 2020) (same). In sum, when there is "persuasive proof of disability and a

remand for further evidentiary proceedings would serve no purpose," remand for calculation of benefits is the proper course. *See Parker*, 626 F.2d at 235.

This case amply meets the standard for remand solely for calculation of benefits. The vocational expert explained that if Russell was limited to the physical exertional level determined by the ALJ's RFC (sedentary work with additional limitations), "and is unable to stay on task for more than 80 percent of a day," then he "would be precluded from all work." Doc. #14 at 147-48. As discussed above, giving the opinions of Russell's treating physicians—both Dr. Zachmann and Dr. Ovanessian—the dispositive weight they required would limit Russell's RFC to being off-task for at least 20 percent of the day. Indeed, as discussed above, even setting aside the opinions of Drs. Zachmann and Ovanessian, substantial evidence does not support an RFC that failed to incorporate a non-exertional limitation of being unable to stay on task for more than 20 percent of a day.

Had the ALJ properly determined Russell's RFC, he would have had no choice but to conclude that Russell was precluded from all work, based on the uncontested testimony of the vocational expert. Remanding to the ALJ for further development only so that the ALJ could reach what amounts to an inevitable conclusion of disability would do nothing more than prolong this already over-lengthy proceeding without purpose. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (even though the court does not reweigh evidence, "where application of the correct legal standard could lead to only one conclusion, we need not remand").

In concluding that the record can only support a finding of disability, I am not persuaded by the ALJ's apparent inference that Russell's brief and inglorious criminal career, which the record indicates consisted of creating bad photocopies of $20 bills and passing them out at gas stations, indicated he had no limitations on his ability to concentrate. *See* Doc. #14 at 34 (ALJ

determination finding counterfeiting "a highly complex task show[ing] that the claimant was able to perform more than simple work"); *id.* at 195 (original ALJ determination, subsequently reversed by the Appeals Council, finding counterfeiting activities indicative of "a higher level of concentration of focus" than medical records indicated).

The ALJ did not develop the record to indicate that Russell's activities were any more sophisticated than what Russell testified to at the hearing: he simply "had a printer and just copied" federal reserve notes. *See id*. at 139 (Tr. 132).[10] That Russell was able to press "scan" and "print" in moments of lucidity does not foreclose or even undermine the conclusion that he suffered an inability to concentrate for more than 80 percent of a given working day.

Finally, I also note that this is the second time the ALJ failed to apply the correct standards to Russell's psychological evidence. *See* Doc. #14 at 208-209 (Appeals Council decision remanding initial ALJ determination). The Commissioner "is not entitled to adjudicate a case *ad infinitum* until it correctly applies the proper legal standard and gathers evidence to support its conclusion." *Sisco v. U.S. Dep't of Health & Human Servs*., 10 F.3d 739, 746 (10th Cir. 1993) (internal quotation marks omitted). "Remands in cases such as this one are worse than purposeless. They are expensive. Plaintiff . . . has already demonstrated entitlement to benefits.

---

[10] Even if it were appropriate for the ALJ, or this Court, to take judicial notice of the sophistication required to overcome the countermeasures put in place to prevent simple photocopying of currency, *see, e.g.*, Javier Nieves *et al.*, *Recognizing Banknote Patterns for Protecting Economic Transactions*, 2010 Workshops on Database and Expert Systems Applications, Inst. Of Electrical and Electronics Engineers, *available at* https://ieeexplore.ieee.org/document/5591895 [https://perma.cc/YE9P-2B47], there is no discussion in the record of whether Russell himself employed any sophisticated circumvention techniques. *See* Doc. #14 at 91-93, 131-34 (Tr. 98-99, 138-39) (hearing testimony). Indeed, in the statement of facts filed in support of Russell's indictment, prosecutors explained that Russell had, after repeatedly using the same bad counterfeits at the same location, shown agents how he produced so-called "inkjet notes" simply by "scanning . . . an image [of a federal reserve note] using digital technology, then printing the image using color liquid ink . . . the counterfeit currency manufactured by Russell contained none of the traditional security features associated with genuine United States currency." *United States v. Russell*, No. 6:11-cr-002120-ACC-DAB, Doc. #20 at 5 (M.D. Fla. 2012). Contrary to the ALJ's unsupported pronouncements of sophistication, it appears that even Russell's residual functional capacity for *criminal* work was limited by poor concentration and an inability to perform complex tasks.

Quite apart from the administrative expenses that another remand would entail, each day of delay exacts a cost from a demonstr[ably] deserving claimant." *Maher v. Bowen*, 648 F. Supp. 1199, 1203 (S.D.N.Y. 1986). *See also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).[11]

## CONCLUSION

For the reasons discussed above, the Commissioner's motion to affirm, Doc. #18, is DENIED, and Plaintiff's motion to reverse, Doc. #16, is GRANTED. The Clerk of the Court is directed to remand this case to the Commissioner for a calculation of benefits under 42 U.S.C. § 405(g). The Clerk of Court shall close this case.

Dated at New Haven this 26th day of March 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[11] I note that the record is replete with discussion of Russell's use of alcohol and other painkillers. "When there is medical evidence of an applicant's drug addiction or alcoholism (DAA), the 'disability' inquiry does not end with the five-step analysis." *Polanco v. Berryhill*, 2019 WL 2183121 at *2 (D. Conn. 2019). Instead, pursuant to 42 U.S.C. § 1382c(a)(3)(J), the Commissioner must further consider whether "a claimant's DAA is a contributing factor material to the determination that the claimant is disabled." *Polanco*, 2019 WL 2183121 at *2. The ALJ concluded that because he determined Russell was not disabled, he need not reach the question of whether Russell's drug addiction was material to the disability determination. Doc. #14 at 45-46 (Tr. 38-39). Because I have concluded that the record does not support a finding that Russell is not disabled, ordinarily it would be appropriate to remand to the ALJ to consider the materiality of Russell's drug addiction to his disability in the first instance. *See, e.g.*, *Lugo v. Barnhart*, 2008 WL 515927, at *21, *report and recommendation adopted*, 2008 WL 516796 (S.D.N.Y. 2008). But here too remand for further proceedings is unwarranted if "application of the correct legal standard could lead to only one conclusion." *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). This is such a case. The record demonstrates that the principal features of Russell's RFC leading to a finding of disability—his acknowledged back problems leading to the various physical limitations, and his limitations to simple tasks, limited interaction with others, and (applying the treating physician rule correctly) limited ability to concentrate—all existed independently of his alcohol or drug addiction. Because the record unequivocally demonstrates that Russell "would still [be] disabled if []he stopped using drugs or alcohol," *Cage v. Comm'r of Soc. Sec*, 692 F.3d 118, 123 (2d Cir. 2012), the "critical question" in the section 1382c(a)(3)(J) inquiry, *ibid.*, it is not necessary for me to remand this question to the ALJ for further development. *See White v. Comm'r of Soc. Sec.*, 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004) (collecting cases). Nor, indeed, has the Commissioner even suggested in his brief that remand on this question would be appropriate, *see* Doc. #18, such that the Commissioner has forfeited any such argument at this late date.